No. 24-4313

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

MARIAN HUDAK,

Defendant-Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

_____

BRIEF FOR THE UNITED STATES AS APPELLEE

_____

SANDRA J. HAIRSTON                    KRISTEN CLARKE
  United States Attorney                Assistant Attorney General


JOANNA G. MCFADDEN                    ELIZABETH PARR HECKER
ASHLEY E. WAID                        MATTHEW N. DRECUN
  Assistant United States Attorneys     Attorneys
  United States Attorney's Office       Department of Justice
  Middle District of North Carolina     Civil Rights Division
  101 S. Edgeworth St., 4th Floor       Appellate Section
  Greensboro, NC 27401                  Ben Franklin Station
                                        P.O. Box 14403
                                        Washington, D.C.  20044-4403
                                        (202) 550-9589

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF JURISDICTION ............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE ................................................................... 2

    A.    Factual Background ................................................................ 2

        1.    Hudak attacks, intimidates, and threatens J.S. ........... 2

        2.    Hudak threatens and attacks his neighbor, J.D. .......... 5

    B.    Procedural Background ............................................................ 7

SUMMARY OF ARGUMENT ................................................................... 14

STANDARD OF REVIEW ....................................................................... 17

ARGUMENT

    I.    The district court did not abuse its discretion by excluding evidence of Hudak's mental health history. ........ 17

        A.    The district court correctly ruled that Hudak's mental health evidence was improper on multiple grounds. .......................................................... 18

            1.    Dr. Graney's opinions were irrelevant and unreliable. ................................................... 19

            2.    Dr. Graney's opinions violated the Insanity Defense Reform Act. ........................................... 22

**TABLE OF CONTENTS (continued):**                    **PAGE**

3.     The district court properly rejected Hudak's attempt to testify about his own mental health. ..............................25

B.     Hudak's reliance on Rule 404(b) to justify admission of his mental health evidence is misplaced......................................................27

II.     The district court did not abuse its discretion by admitting evidence that Hudak possessed Nazi paraphernalia............................................................32

A.     The district court correctly admitted Hudak's Nazi paraphernalia. ....................................34

1.     Hudak's Nazi paraphernalia was significant evidence that he acted because of his victims' race, color, and national origin...............................34

2.     Hudak opened the door to admission of his Nazi paraphernalia. ....................................37

B.     Hudak fails to show that the district court erred by admitting his Nazi paraphernalia. .........................40

CONCLUSION ..........................................................................48

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                              **PAGE**

*Crane v. Kentucky*, 476 U.S. 683 (1986)............................................31-32

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ............19-20

*Grayson O Co. v. Agadir Int'l LLC*,
    856 F.3d 307 (4th Cir. 2017) ....................................................31, 45

*Holmes v. South Carolina*, 547 U.S. 319 (2006) ...............................31-32

*Huddleston v. United States*, 485 U.S. 681 (1988) ................................34

*Kotteakos v. United States*, 328 U.S. 750 (1946).........................17, 46-47

*Morgan v. Foretich*, 846 F.2d 941 (4th Cir. 1988) .................................43

*Mullen v. Princess Anne Volunteer Fire Co.*,
    853 F.2d 1130 (4th Cir. 1988) ........................................................42

*Turpin v. Kassulke*, 26 F.3d 1392 (6th Cir. 1994) .................................41

*United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984) ...........30

*United States v. Al-Hamdi*, 356 F.3d 564 (4th Cir. 2004) .....................18

*United States v. Allen*, 341 F.3d 870 (9th Cir. 2003).........................35-36

*United States v. Bakker*, 925 F.2d 728 (4th Cir. 1991)...........................42

*United States v. Birchette*, 908 F.3d 50 (4th Cir. 2018)....................37, 40

*United States v. Boyd*, 55 F.4th 272 (4th Cir. 2022)...............................18

*United States v. Briley*, 770 F.3d 267 (4th Cir. 2014).............................33

**CASES (continued):** **PAGE**

*United States v. Caldwell*, 7 F.4th 191 (4th Cir. 2021) ......................... 17

*United States v. Cameron*, 907 F.2d 1051 (11th Cir.1990) .................... 24

*United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014) ......................... 36

*United States v. Chandler*, 393 F.2d 920 (4th Cir. 1968) (en banc) ....... 23

*United States v. Cohen*, 888 F.2d 770 (11th Cir. 1989) ......................... 30

*United States v. Daniels*, 932 F.3d 1120 (8th Cir. 2019) ....................... 29

*United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008) ...................... 20-21

*United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985) ...................... 20

*United States v. Edwards*, 702 F.2d 529 (5th Cir. 1983) ....................... 45

*United States v. Elsheikh*, 103 F.4th 1006 (4th Cir. 2024) .............. 31, 45

*United States v. Ging-Hwang Tsoa,*
    592 F. App'x 153 (4th Cir. 2014) .................................................... 27

*United States v. Helton*, 944 F.3d 198 (4th Cir. 2019) ........................... 28

*United States v. Hughes*, 895 F.2d 1135 (6th Cir. 1990) ....................... 28

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009) .................. 17, 46

*United States v. Keita*, 742 F.3d 184 (4th Cir. 2014) ............................. 44

*United States v. Magleby*, 241 F.3d 1306 (10th Cir. 2001) .................... 35

*United States v. McClure*, 546 F.2d 670 (5th Cir. 1977) ....................... 30

*United States v. McInnis*, 976 F.2d 1226 (9th Cir. 1992) ................. 36, 41

**CASES (continued):** **PAGE**

*United States v. McLaurin*, 764 F.3d 372 (4th Cir. 2014) ..................... 37

*United States v. Peninger*, 456 F. App'x 214 (4th Cir. 2011) ................. 24

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997) .......... 29, 33, 43-44

*United States v. Recio*, 884 F.3d 230 (4th Cir. 2018) ............................ 41

*United States v. Sheldon*, 107 F.3d 868 (4th Cir. 1997) (Tbl.) .............. 36

*United States v. Smith*, 919 F.3d 825 (4th Cir. 2019) ........................... 19

*United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991)........................ 30

*United States v. Taoufik*, 811 F. App'x 835 (4th Cir. 2020) .................. 24

*United States v. Walker*, 32 F.4th 377 (4th Cir. 2022) .................... 17, 46

*United States v. Worrell*, 313 F.3d 867 (4th Cir. 2002) .............. 13, 22-26

*United States v. Young*, 916 F.3d 368 (4th Cir. 2019) ............... 19, 36, 41

**STATUTES:**

Insanity Defense Reform Act
   18 U.S.C. 17(a) ........................................................................ 13, 23

18 U.S.C. 245(b)(2) ....................................................................... 7, 16, 34

18 U.S.C. 245(b)(2)(B) .................................................................... 1, 35

18 U.S.C. 3231 .................................................................................... 1

28 U.S.C. 1291 .................................................................................... 1

42 U.S.C. 3631(a)........................................................................ *passim*

**RULES:**                                             **PAGE**

Fed. R. Crim. P. 12.2(b) .................................................. 11

Fed. R. Evid. 103(a)(1) .................................................. 44

Fed. R. Evid. 403 .................................................. 26, 33

Fed. R. Evid. 404(b) .................................................. 17

Fed. R. Evid. 404(b)(1) .................................................. 28, 33

Fed. R. Evid. 404(b)(2) .................................................. 34

Fed. R. Evid. 404(b)(3) .................................................. 43

Fed. R. Evid. 702(b)-(d) .................................................. 19

**MISCELLANEOUS:**

2 Weinstein's Federal Evidence § 403.06 (2024) .................................................. 45

Black's Law Dictionary (12th ed. 2024) .................................................. 28

## STATEMENT OF JURISDICTION

This appeal is from a final judgment in a criminal case. The district court had jurisdiction under 18 U.S.C. 3231. It entered final judgment against defendant-appellant Marian Hudak on June 10, 2024. JA724.[1] Hudak filed a timely notice of appeal. JA731. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

A jury convicted defendant-appellant Hudak of two federal crimes for attacks against Black and Hispanic victims in and around Concord, North Carolina. First, the jury convicted Hudak of intimidating and interfering with a Black driver for using the roads around Concord because of the driver's race and color, in violation of 18 U.S.C. 245(b)(2)(B). Second, the jury convicted Hudak of injuring, intimidating, and interfering with his Hispanic neighbor for occupying the dwelling next door because of the neighbor's race and national origin, in violation of 42 U.S.C. 3631(a). Hudak raises the following issues on appeal:

---

[1] "JA__" refers to the page number of the Joint Appendix filed with Hudak's principal brief. "Br. __" refers to Hudak's principal brief.

1.  Whether the district court erred by excluding expert and lay testimony regarding Hudak's history of mental health diagnoses and treatment, which he offered to prove that he did not commit the charged offenses because of the victims' race, color, and national origin.

2.  Whether the district court erred by admitting evidence that Hudak possessed Nazi flags and other Nazi paraphernalia.

## STATEMENT OF THE CASE

### A.     Factual Background

#### 1.     Hudak attacks, intimidates, and threatens J.S.

J.S. is a Black man, now 29 years old, who lives in Concord with his girlfriend and their two young children.  JA236-237.  On October 13, 2022, J.S. was driving home from work.  JA237-238.  As he drove down Concord Parkway toward his apartment, he noticed "a black Dodge truck with a bunch of flags, rebel flags, [and] stickers" coming up behind him and "[d]riving reckless."  JA238-239.  The driver of the truck was Marian Hudak.  JA240.

As traffic slowed, the truck pulled up alongside J.S., and he "heard a bunch of yelling."  JA239-240.  Looking over, J.S. saw that Hudak "was pointing his finger, yelling out racial slurs to [J.S.], [and] telling

[J.S.] to 'Come here, boy.'" JA240. J.S. had not made any comments or gestures toward Hudak. JA258. Yet, as J.S. testified, Hudak "called [J.S.] a nigger" and said that "he was going to get [J.S.]." JA240.

Traffic prevented J.S. from getting away from Hudak, who pulled his truck in front of J.S.'s car to block him. JA240. Hudak got out of the truck, "still yelling racial slurs" and "calling [J.S.] a nigger." JA241. Hudak's head was shaved, and he wore black gloves and boots, into which he had tucked his pants "military style," as Hudak put it. JA572-573. Hudak approached J.S.'s car, punching the window "four or five times." JA241. Frightened, J.S. managed to maneuver his car around Hudak's truck, but Hudak got back into the truck and pursued him. JA242. On the way home, J.S. called ahead to his girlfriend, asking her to bring a gun out to him when he arrived so that he could defend himself. JA246-247. He also called 911. JA247.

J.S. soon reached his apartment complex, with Hudak close behind. JA248-249. The complex had only one entrance and exit, which Hudak blocked with his truck, as shown in this photo from the complex's video surveillance:

- 3 -



JA19, JA248-250, JA257, JA263, JA572.  J.S. remained on the phone
with 911, as Hudak kept shouting at J.S. that "he knows where [J.S.]
live[s]," that "he'll be back," and "that he was going to shoot [J.S.] and
'shoot that bitch,'" referring to J.S.'s girlfriend, A.R.  JA255.

As A.R. recalled, Hudak yelled, "I'm going to shoot you, you
nigger.  I know where you stay, I know where you live, I have pictures."
JA270, JA577 (Hudak admitting he yelled "nigger" at J.S.).  Hudak
terrified A.R.  She testified that "he knew where we were," and "[h]e
made threats to come back and shoot and kill us."  JA274.  At the time,
her young son was upstairs in their apartment.  JA274.  Eventually,
Hudak drove away, and the police arrived soon after that.  JA257-258.

The attack left J.S. "very scared and frantic" as well, according to a Concord police officer who interviewed J.S. shortly after the attack. JA285. Hudak's aggression had a lasting impact. Following the attack, J.S. changed his driving routes "to stay off of Concord Parkway as much as possible." JA258.

### 2. Hudak threatens and attacks his neighbor, J.D.

J.D. is a Mexican-American man, now 21 years old. JA411. Born in North Carolina, he lives in Concord with his mother, stepfather, and sisters. JA411-412. Hudak was their next-door neighbor. JA412. J.D. and his family were living in their home on Red Bird Circle in Concord before Hudak moved in next door. JA369, JA412-413. By that time, J.D. already had encountered Hudak twice before on the roads in Concord. One time, Hudak used his "big Ram truck" to "r[u]n [J.D.] off the road." JA413. Another time, Hudak drove alongside J.D., rolled down his window, and yelled "Fucking Mexican, go back to Mexico, go to hell." JA414.

On November 27, 2021, J.D. woke up to go to work and found that his car had been egged on the driver's side, which faced Hudak's house. JA369-370, JA415. That evening, J.D. was home with his girlfriend,

L.L.  JA416, JA420.  The two came outside so J.D. could drive her home.
JA416.  Hudak appeared, yelling in an "aggressive" tone that J.D.'s car
was "too loud" and its headlights were "too bright," and that "he was
going to kick [J.D.'s] butt."  JA420.  As L.L. got into the car, Hudak said
to J.D. that J.D.'s family is "just a whole bunch of fucking Mexicans
and . . . should go to hell."  JA421.

     After J.D. said he would "defend" himself if Hudak came onto the
property, Hudak charged J.D.  JA421, JA424.  Hudak "said that he was
going to kill" J.D. and chased him around to the back of J.D.'s car,
where J.D. pulled out his shotgun.  JA425.  Hudak started punching
and kicking J.D., landing punches to his ribs and face.  JA425-426.
Hudak then tried taking the shotgun from J.D., who handed it to L.L.
JA428-429.  Hudak charged J.D. again, repeating that "he was going to
kill" J.D.  JA430.  He hit J.D., knocking him to the ground, and grabbed
L.L. by the hair.  JA438.  After fighting a while longer, J.D. and L.L.
managed to push Hudak off.  JA430.  When other neighbors came
outside, Hudak returned to his house.  JA430.

     Afterwards, J.D. moved out of his family's home, believing that
Hudak had a problem with him in particular.  JA430-431.  But Hudak

- 6 -

continued to harass J.D.'s family, "yelling cuss words" at his mother and young sisters, so J.D. moved back in.  JA431.  The family also built a fence between their house and Hudak's and installed more security cameras to protect themselves.  JA431.

## B.  Procedural Background

1.  In June 2023, a grand jury returned a two-count indictment against Hudak.  JA14-16.  The first count, under 18 U.S.C. 245(b)(2), charged that Hudak, by force and threat of force, willfully intimidated and interfered with J.S. because of his race and color and because he was enjoying a State-provided facility, namely, the roads in and around Concord where Hudak attacked and pursued him.  JA14-15.  The second count, under 42 U.S.C. 3631(a), charged that Hudak, by force and threat of force, willfully injured, intimidated, and interfered with J.D. because of his race and national origin, and because J.D. was occupying a dwelling.  JA15-16.

2.  Two evidentiary disputes arose ahead of trial.  One dispute concerned the government's use of extrinsic evidence to prove Hudak's motive and intent in the charged offenses.  Before trial, the government filed a notice of its intention to offer evidence of Hudak's prior acts to

show that his conduct toward J.S. was because of J.S.'s race and color and his conduct toward J.D. was because of J.D.'s race and national origin. JA17. The district court generally deemed this evidence permissible for the government to present at trial.

For instance, the district court admitted testimony from J.D.'s mother that Hudak was "hateful" towards her, saying things like "fucking Mexicans, go back to your country." JA370. The jury also heard that on her first day of school, J.D.'s nine-year-old sister walked past Hudak's house to reach the school bus and encountered Hudak saying, "These motherfucking Mexicans, they need to go back to their country, they don't belong here." JA374. The government also showed Hudak's Facebook posts about J.D.'s family, including a picture of their home that Hudak captioned, "Idiots from Mexico in my neighborhood, illegal immigrants." JA377-378.

The government also presented the testimony of other Black and Hispanic people that they had faced harassment and aggression from Hudak while driving in Concord around the same time as the charged offenses. A Black woman who lived in the area testified that Hudak drove up behind her in his "[b]ig black truck with flags," shouting over a

- 8 -

speaker attached to his truck that "Black[s] and Mexicans, you need to go back to your country." JA312-314. Another Black woman was driving with her partner in Concord in December 2022, and as she turned near Hudak at an intersection, he yelled "Fuck you, nigger" at them and gave them the middle finger. JA317-318. A Hispanic man likewise testified that he was driving when Hudak yelled at him, "You should go back to your country." JA325-326. After tailgating this witness's car, Hudak swerved his truck in front and got out to "punch[] [his] driver's side door." JA327-329.

At a pretrial conference, however, the court limited the government's introduction of paraphernalia belonging to Hudak as "evidence of racial animus." JA166. The court permitted the introduction of certain items: a Confederate flag that Hudak displayed from his truck; a Ku Klux Klan (KKK) flag; and a comic book with racist caricatures of Black and Hispanic people found at Hudak's house. JA166, JA28 (images of comic book). But the court excluded evidence of Nazi paraphernalia also found at Hudak's house: two Nazi flags bearing swastikas, a swastika patch, and a ring bearing the Iron Cross. JA169. The court reasoned that Nazi symbols denote antisemitism, so

Hudak might be penalized unfairly for antisemitic views not directly related to the charged offenses.  JA157-160.  But the court cautioned Hudak that it was excluding the Nazi paraphernalia only "preliminarily," "subject to hearing the evidence in the case."  JA169.

Once trial began, the district court warned Hudak multiple times that his Nazi possessions could become "fair game" depending on the defense he chose to present.  JA206, JA230-231.  Hudak ultimately decided to take the stand, where he referred expressly in his direct examination to having "Nazi flags."  JA540.  Hudak also claimed that he collected items only for historical interest, and he insisted that he kept his KKK flag folded up in the closet, never on display.  JA519-520, JA542.  Ruling that Hudak "opened the door" by casting himself as a "military collector," the district court permitted the government to cross-examine Hudak on his numerous Nazi possessions.  JA586-590, JA592-593.  The court also reasoned that Hudak put his credibility in question by testifying on direct examination that he never displayed his KKK flag and by claiming on re-direct examination that he never displayed his Nazi flags.  JA542, JA596, JA601.  The court thus permitted the government to present a rebuttal witness, a state

- 10 -

probation officer, who testified that he saw a Nazi flag draped over Hudak's bedroom door.  JA601, JA604-606.

3.  The other evidentiary dispute to arise before trial concerned Hudak's attempt to offer expert testimony about his mental health history.  A forensic psychologist, Dr. Dawn Graney, interviewed Hudak on two occasions in September 2023 to determine his competency to stand trial.  JA741-742.  Dr. Graney produced a report dated October 31, 2023, that provided "a general assessment of Mr. Hudak's mental health status."  JA741.  The report reviewed Hudak's "significant mental health history," including diagnoses and treatment for obsessive-compulsive disorder, delusional disorder (persecutory type), generalized anxiety disorder, major depressive disorder (then in "full remission"), and moderate alcohol use disorder (then in "sustained remission").  JA755, JA759.  Despite these diagnoses, Dr. Graney considered Hudak's prognosis "fair" and his disorders "largely controlled."  JA759.  Hudak did not argue that he was incompetent to stand trial.

Hudak instead filed a notice under Federal Rule of Criminal Procedure 12.2(b) "of his intent to present expert testimony on his

mental condition bearing on the issue of guilt" and produced a redacted

version of Dr. Graney's report to the government.  JA81, JA741.  The

report was accompanied by a disclosure notice signed by Dr. Graney

and dated November 30, 2023.  JA738-739.  In the disclosure notice, Dr.

Graney now opined:

> It is more likely than not to a reasonable degree of medical
> certainty that [Hudak] was suffering from serious mental
> health issues during the alleged conduct in this action, that
> his mental health issues contributed to his alleged conduct
> during this period, and that he would not have engaged in
> the alleged conduct but for the serious mental health issues
> that impacted his daily functioning and caused him
> considerable distress.

JA125 (quoting JA739).  The government moved to exclude Dr. Graney's

opinions.  JA764.

After a hearing, the district court ruled that Dr. Graney's opinions

were inadmissible because they were irrelevant and unreliable,

violating Federal Rule of Evidence 702.  JA130.  The facts in her report

about Hudak's condition during the relevant period—from his

November 2021 attack on J.D. to his October 2022 attack on J.S.—were

"limited at best," and what little there was indicated he was "largely

stable" at the time.  JA128, JA131.  Dr. Graney also drew no specific

connection between Hudak's mental health symptoms and the charged

offenses, only opining vaguely that his symptoms somehow "contributed" to his conduct. JA131-132. The court added that these shortcomings "would also apply to preclude introduction of Dr. Graney's opinions under the IDRA," the Insanity Defense Reform Act, which prohibits offering evidence of mental illness as "a diminished capacity or justification defense." JA126 n.4 (citing *United States v. Worrell*, 313 F.3d 867 (4th Cir. 2002)); *see also* JA115-118 (discussing preliminarily at hearing why admitting Dr. Graney's opinions would be improper under IDRA).[2]

Dr. Graney therefore did not testify at trial. Hudak attempted to testify about his history of mental health diagnoses, symptoms, and treatment, but the district court sustained the government's objections to that testimony. JA514-515. Dr. Graney was permitted to testify later at Hudak's sentencing. JA657.

---

[2] IDRA provides that it is an affirmative defense to a prosecution under a federal statute "that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. 17(a). "Mental disease or defect does not otherwise constitute a defense." *Ibid.*

4.  The trial took place from January 8 to January 11, 2024, with testimony from 24 witnesses, including Hudak.  JA8-9, JA191, JA226-227, JA453.  The jury convicted Hudak of both counts.  JA9 (docket entry no. 63).  The district court later sentenced Hudak to 41 months' incarceration:  12 months for Count 1 (concerning J.S.) and 29 months for Count 2 (concerning J.D.), to run consecutively.  JA725.

5.  The district court entered judgment against Hudak in June 2024.  JA724.  Hudak's appeal timely followed.  JA731.

## SUMMARY OF ARGUMENT

This Court should affirm Hudak's convictions.

1.  The district court did not abuse its discretion in excluding evidence of Hudak's mental health diagnoses and treatment.  Hudak does not challenge the district court's actual reasons for excluding the evidence, much less explain how the court erred.  The district court correctly held that the opinions of Hudak's expert, Dr. Dawn Graney, were inadmissible under Rule 702 because they were unreliable and irrelevant.  The court also properly held that the admission of Dr. Graney's opinions would violate the Insanity Defense Reform Act (IDRA), which bars the use of mental health evidence in federal

prosecutions to suggest that a defendant's conduct should be excused because he was incapable of controlling himself. IDRA barred Hudak's own testimony about his mental health as well. Such testimony also was inadmissible under Federal Rule of Evidence 403's exclusion of confusing or misleading evidence.

Hudak's invocation of Federal Rule of Evidence 404(b) is inapt. Rule 404(b) does not apply here because Hudak's mental health history is not a prior crime, wrong, or act within the meaning of the rule. Casting this issue as a "reverse 404(b)" matter, as Hudak attempts for the first time on appeal, does not change the result. The proper use of reverse-404(b) evidence, as demonstrated by the cases upon which Hudak himself relies, is for defendants to exculpate themselves by pointing to the bad acts of *other individuals*, not to excuse their own offense conduct by suggesting that they were unable to control their behavior. Even if Rule 404(b) applied, it does not supersede IDRA and the evidentiary rules that Dr. Graney's opinions and Hudak's attempted testimony failed to satisfy—Rules 702 and 403, respectively.

2. The district court also did not abuse its discretion by admitting evidence that Hudak possessed Nazi paraphernalia. Such extrinsic

evidence is common as well as significant evidence of defendants'
motive and intent for charges, like Hudak's under 18 U.S.C. 245(b)(2)
and 42 U.S.C. 3631(a), that require proof of the defendant's
discriminatory motive and intent.  Moreover, the district court initially
kept out evidence of Hudak's Nazi possessions, while repeatedly
warning him against opening the door to the government's presentation
of this evidence.  Hudak proceeded to do just that, expressly mentioning
his "Nazi flags" on direct examination while trying to portray himself
merely as a collector of historically interesting material.

Hudak does not address the case law upholding admission of
items like his Nazi possessions as evidence of motive and intent, nor
does he acknowledge opening the door to their admission at trial despite
the district court's multiple warnings.  His arguments about the Nazi
paraphernalia go to their weight, not their admissibility.  He also fails
to show the Nazi items were cumulative given other evidence of his
racial and ethnic animus.  The district court properly admitted the Nazi
relics as a specific rebuttal to Hudak's misleading testimony, and their
admission—even if erroneous—was harmless in any event.

## STANDARD OF REVIEW

A district court's decision to admit or exclude evidence is reviewed for abuse of discretion. *United States v. Walker*, 32 F.4th 377, 394 (4th Cir. 2022). Abuses of discretion are "subject to harmless error review." *Ibid.* (quoting *United States v. Caldwell*, 7 F.4th 191, 204 (4th Cir. 2021)). "Erroneously admitted evidence is harmless if a reviewing court is able to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

## ARGUMENT

## I.  The district court did not abuse its discretion by excluding evidence of Hudak's mental health history.

Hudak argues that the district court erred by not permitting him to present evidence of his mental health diagnoses and treatment under Federal Rule of Evidence 404(b). Br. 5-7. This argument fails. Hudak does not challenge the district court's actual reasons for excluding this evidence. The district court properly excluded the opinions of Hudak's expert, Dr. Dawn Graney, under both Federal Rule of Evidence 702 and

IDRA.  IDRA and Federal Rule of Evidence 403 likewise justified the

court's exclusion of Hudak's testimony about his mental health.[3]

## A.   The district court correctly ruled that Hudak's mental health evidence was improper on multiple grounds.

The district court correctly excluded the opinions of Hudak's

mental health expert, Dr. Graney.  Two opinions were at issue:  first,

Dr. Graney's general assessment of Hudak's mental health in her

October 31, 2023, report; and second, her causal opinion in the

November 30, 2023, disclosure notice that Hudak's "mental health

issues contributed to his alleged conduct" and he "would not have

engaged in the alleged conduct but for [those] serious mental health

issues."  JA124-125 (quoting JA739).

As the district court correctly held, admission of these opinions

would be improper on multiple grounds.  Dr. Graney's opinions were

unreliable and irrelevant under Rule 702.  JA130-134.  Dr. Graney's

---

[3] If Hudak attempts in his reply brief to challenge the district court's actual reasons for excluding his mental health evidence, it will be too late.  "It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned." *United States v. Boyd*, 55 F.4th 272, 279 (4th Cir. 2022) (quoting *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004)).

opinions also violated IDRA by presenting an impermissible

"diminished capacity or justification defense" for Hudak's conduct.

JA126 n.4. IDRA also barred Hudak's own testimony about his mental

health, as did Rule 403's exclusion of confusing or misleading

testimony.

### 1. Dr. Graney's opinions were irrelevant and unreliable.

"Expert testimony is admissible under Federal Rule of Evidence

702 if it involves specialized knowledge that will assist the trier of fact

in understanding the evidence or determining a fact in issue, and is

both reliable and relevant." *United States v. Young*, 916 F.3d 368, 379

(4th Cir. 2019) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 589-592 (1993)). To be reliable, an expert's opinion must be "based

on sufficient facts or data," be "the product of reliable principles and

methods," and "reflect[] a reliable application of the principles and

methods to the facts of the case." Fed. R. Evid. 702(b)-(d); *United States*

*v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019). "[A] highly deferential

standard [is] afforded to the district court in determining an expert

witness's reliability." *Young*, 916 F.3d at 380. To be relevant, expert

testimony must be "sufficiently tied to the facts of the case that it will

aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).

The contents of Dr. Graney's report were not relevant or reliable because the report had little to say about Hudak's mental health during the relevant period, from his November 2021 attack on J.D. to his October 2022 attack on J.S. Dr. Graney's two interviews of Hudak in September 2023 occurred nearly a year after the October 2022 incident with J.S. and nearly two years after the November 2021 incident with J.D. JA128.

As to the relevant period, Dr. Graney stated that Hudak had reported some "political conflicts" with "neighbors" in June 2021 (JA128 (citation omitted)), with no evident connection to his mental illness. She also stated that Hudak experienced sluggishness, problems concentrating, and problems sleeping in December 2021, which Hudak attributed to his separation from his wife. JA129. She wrote that his obsessive-compulsive disorder symptoms worsened in March 2022 but were somewhat better the next month. JA129. As the district court correctly observed, that handful of facts suggested Hudak "was relatively stable during the relevant time period." JA131; *cf. United*

*States v. Day*, 524 F.3d 1361, 1370 (D.C. Cir. 2008) (affirming exclusion of expert who did "nothing more than surmise or speculate" about defendant's condition during offense conduct).

Dr. Graney's opinions in the disclosure notice were no sounder. As the district court correctly observed, Dr. Graney's opinion that Hudak "was suffering from serious mental health issues" during the period of the offense conduct contradicted the historical account in her report. JA130-131 (quoting JA738-739). The report included "no formal opinion as to [Hudak]'s mental status at the time of the alleged offenses other than" the pieces of historical information noted above. JA129. That historical information, as explained, indicated Hudak was relatively stable then, not actively symptomatic. JA131.

The court also noted that Dr. Graney's report did not explain "*how* [Hudak's] symptoms, even if they were occurring at the time of the alleged offenses, related to [Hudak's] alleged conduct." JA131. Dr. Graney's statement in the disclosure notice simply made the "conclusory" assertion that Hudak's symptoms did, somehow, contribute to his offense conduct. JA131. But as the court correctly ruled, that conclusory claim was "far too vague to be relevant." JA131-132.

- 21 -

Dr. Graney's opinions in the disclosure notice also were irrelevant and unreliable because they purported to explain a simplified, sanitized account of Hudak's alleged offenses. JA132-133. The disclosure notice characterized the offense conduct as Hudak and his victims "insult[ing] and threaten[ing] each other." JA738. The district court aptly deemed that "a woefully incomplete description" of the United States' allegations against Hudak, which involved, among other things, "using racial epithets," "blocking the alleged victim's car" (referring to J.S.), and "displaying a Confederate flag." JA132 (citing JA18-20, JA22-26). Because Hudak's actual conduct demonstrated racial motivation and more aggression than the sanitized version Dr. Graney set out to explain, the court concluded that her opinions would not aid the jury in resolving the factual disputes the trial actually presented. JA132-133.

## 2. Dr. Graney's opinions violated the Insanity Defense Reform Act.

As the district court correctly held, Dr. Graney's opinions also were inadmissible because they violated IDRA's limits on the defensive use of mental health evidence. JA126 n.4; *see also* JA115-118 (district court's preliminary discussion of IDRA at pretrial hearing). "IDRA codified the federal standard for an insanity defense." *United States v.*

*Worrell*, 313 F.3d 867, 872 (4th Cir. 2002).  IDRA provides one
affirmative defense:  "that, at the time of the commission of the acts
constituting the offense, the defendant, as a result of a severe mental
disease or defect, was unable to appreciate the nature and quality or
the wrongfulness of his acts."  18 U.S.C. 17(a).  "Mental disease or
defect does not otherwise constitute a defense."  *Ibid.*

IDRA therefore "bars a defendant who is not pursuing an insanity
defense from offering evidence of his lack of volitional control as an
alternative defense."  *Worrell*, 313 F.3d at 875.  Before IDRA was
enacted in 1984, this Court followed the American Law Institute's
Model Penal Code, under which a defendant could argue that a mental
disease or defect deprived him of the "capacity" to "conform his conduct
to the requirements of law."  *United States v. Chandler*, 393 F.2d 920,
926 (4th Cir. 1968) (en banc) (quoting Model Penal Code).  "That is, a
defendant could escape criminal liability if he was able to prove he
lacked substantial capacity to control his actions, even though he may
have been aware of what he was doing and understood that his actions
were unlawful."  *Worrell*, 313 F.3d at 872.  "In passing IDRA, Congress
rejected the 'volitional prong'" of the American Law Institute's test.

*Ibid.* (quoting *United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir. 1990)).

Thus, IDRA does not permit a defendant to argue that he "was not able to control his behavior or reflect on potential consequences before acting." *Worrell*, 313 F.3d at 875. Nor can a defendant present evidence of mental illness in order "to excuse his conduct," *United States v. Taoufik*, 811 F. App'x 835, 840 (4th Cir. 2020), or to suggest "why he could not help himself commit" the alleged offense, *United States v. Peninger*, 456 F. App'x 214, 216 (4th Cir. 2011).

In the district court, Hudak conceded certain elements of the charged offenses. He acknowledged engaging in the offense conduct. JA109. He also conceded that he had "the willful mens rea" for the offenses. JA109. He disputed only that he acted "because of the victim's race or color," and it was to negate this element that he wished to offer Dr. Graney's opinions. JA110.

The district court correctly determined that Hudak's attempted use of Dr. Graney's opinions constituted "a diminished capacity or justification defense" that IDRA does not permit. JA126 n.4 (citing *Worrell*, 313 F.3d at 874). The suggestion that Hudak's "mental health

issues contributed to his alleged conduct . . . and that he would not have engaged in the alleged conduct but for the serious mental health issues" was in the nature of "a legal excuse," which IDRA prohibits.  JA118.

Hudak's arguments on appeal confirm that the district court was right to exclude Dr. Graney's opinions.  Hudak argues that Dr. Graney's opinions would have helped him "show the jury" that "his symptoms cause him to be angry, paranoid, misjudge other people's intentions, act hostile, and *poorly regulate his emotions*" and that his mental health problems "contributed to his *poor behavior regulation*."  Br. 6-7 (emphases added).  These statements are just other ways of saying that Hudak "was not able to control his behavior or reflect on potential consequences before acting"—precisely the "volitional control" defense that IDRA eliminated.  *Worrell*, 313 F.3d at 875.

### 3.    The district court properly rejected Hudak's attempt to testify about his own mental health.

The district court's refusal to allow Hudak to give lay testimony about his mental health was not an abuse of discretion.  When the court sustained the government's objections to the direct examination of Hudak about his mental health diagnoses, symptoms, and treatment, Hudak did not make any arguments for the testimony's admissibility.

JA514-515.  Because Hudak sought no colloquy, the court did not

elaborate on its rulings excluding Hudak's attempted testimony about

his mental health.  Accordingly, the pretrial arguments and rulings on

Dr. Graney's mental health opinions furnish the best understanding of

the court's reasons for excluding Hudak's testimony.

For the reasons discussed above, IDRA barred Hudak's testimony

about his mental health.  As explained, his attempt to testify about his

diagnoses and symptoms was in the nature of a legal excuse for his

conduct, which IDRA does not permit.  *See Worrell*, 313 F.3d at 872.

The district court also properly exercised its discretion under Rule

403 to exclude Hudak's testimony.[4]  Rule 403 authorizes courts to

"exclude relevant evidence if its probative value is substantially

outweighed by a danger of . . . unfair prejudice, confusing the issues,

[or] misleading the jury," among other problems.  Fed. R. Evid. 403; *see,*

---

[4] The government previously had urged Rule 403 as a basis for excluding Dr. Graney's opinions because they would confuse the issues and mislead the jury.  JA778-779.  The government's objections to Hudak's mental health testimony at trial and the district court's rulings excluding that testimony are properly understood as relying on Rule 403 as well.

*e.g.*, *United States v. Ging-Hwang Tsoa*, 592 F. App'x 153, 155-156 (4th Cir. 2014) (affirming exclusion under Rule 403 of testimony regarding defendant's "intellectual abilities" that was "not linked to her mental state at the time of the charged offense conduct" because "admission of the opinions would confuse the issues and mislead the jury"). Hudak's testimony was not probative of any element of the offenses that the jury was tasked to decide. The court's exclusion of Hudak's mental health testimony thus was appropriate to avoid confusing the issues and misleading the jury.

## B. Hudak's reliance on Rule 404(b) to justify admission of his mental health evidence is misplaced.

Hudak's reliance on Rule 404(b) to justify the admission of his mental health evidence is misplaced because the rule is inapt and cannot overcome the problems that the district court identified in Hudak's mental health evidence. The court therefore committed no error in not admitting Hudak's mental health evidence under the "reverse 404(b)" theory that Hudak articulates for the first time on appeal. Hudak's only authorities involve defendants presenting the prior acts of *other individuals* to exonerate themselves. No authority

- 27 -

supports Hudak's attempt to use his mental health evidence to suggest he was unable to control his *own* behavior.

1.  Rule 404(b) is inapplicable here by its terms.  The rule applies to "other crime[s], wrong[s], or act[s]" distinct from the charged offenses.  Fed. R. Evid. 404(b)(1).  The term "act" is not defined in the Rules, so "we look to [its] ordinary meaning."  *United States v. Helton*, 944 F.3d 198, 207 (4th Cir. 2019) (construing "sexual act" in federal statute).  An "act" is "[s]omething done or performed, esp[ecially] voluntarily," or "a deed."  *Act*, Black's Law Dictionary (12th ed. 2024).  A history of mental health diagnoses or a general assessment of one's mental health is not an "act."  *Cf. United States v. Hughes*, 895 F.2d 1135, 1147 (6th Cir. 1990) (holding that statement that defendant previously was attorney "does not fall within the precluded category of prior bad acts").  The text of Rule 404(b) thus makes clear that it does not provide the standard for determining the admissibility of Hudak's mental health evidence.

Even if Rule 404(b) applied, it would not render admissible evidence that fails under other rules.  All Rule 404(b) does is place a single restraint on the evidentiary use of prior crimes, wrongs, or acts:

- 28 -

they may not be "offered to prove 'the character of a person in order to show action in conformity therewith.'" *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997). Rule 404(b)'s role is to limit evidence, not override other rules. The rule does not somehow confer admissibility on expert testimony that would otherwise fail Rule 702 or excessively prejudicial evidence that would otherwise fail Rule 403. *See id.* at 995 (explaining "prior-acts evidence" must satisfy Rule 403).

2. The reverse-404(b) cases on which Hudak relies (Br. 8-9) do not support the admissibility of his mental health evidence. As Hudak himself concedes, each of these cases involves a defendant "wish[ing] to introduce evidence *against a third party* to exculpate himself." Br. 5-6 (emphasis added). They do not involve defendants seeking to present their own mental health history in an attempt to excuse their conduct. For instance, Hudak cites *United States v. Daniels*, in which a felon-in-possession defendant sought to create doubt about who owned the gun in question, by showing that another occupant of the car where the gun was found had a previous firearm conviction. *See* 932 F.3d 1120, 1123-1125 (8th Cir. 2019).

Hudak's other reverse-404(b) cases also involved prior-acts evidence about third parties, invoked by defendants to demonstrate their own innocence or reduced culpability.  For example, *United States v. Stevens*, 935 F.2d 1380, 1405-1406 (3d Cir. 1991), concerned a defendant's "'reverse 404(b)' evidence" of a highly similar offense committed by another suspect, which suggested that the charged offense actually was committed by that other suspect.  *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989), addressed fraud defendants' evidence that the prior acts of their alleged co-conspirator, who testified for the government, showed he was capable of carrying out the fraud scheme without the defendants.  *United States v. Aboumoussallem*, 726 F.2d 906, 910-911 (2d Cir. 1984), involved a drug-trafficking defendant who claimed he was duped into travelling with a drug-filled suitcase and wanted to show that the same person who tricked him into carrying the suitcase had duped another innocent party into doing the same thing.  And *United States v. McClure*, 546 F.2d 670, 672-673 (5th Cir. 1977), concerned a defendant who sought to show that he had been coerced into selling drugs to a federal informant with evidence that the

informant previously had coerced others to take part in drug transactions.

In sum, these cases lend no support to Hudak's argument that his mental health history constitutes prior "acts" governed by Rule 404(b) or that the rule somehow requires their admission.

3.  Finally, Hudak makes the cursory suggestion that he was deprived of "a meaningful opportunity to present a complete defense." Br. 7.  Hudak does not develop this argument, and a party waives appellate review of an argument "when the opening brief merely 'takes a passing shot at the issue.'"  *United States v. Elsheikh*, 103 F.4th 1006, 1012 n.5 (4th Cir. 2024) (quoting *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017)).  Hudak's argument would fail in any case because the district court properly excluded Hudak's mental health evidence under settled rules.

Hudak cites *Holmes v. South Carolina*, 547 U.S. 319 (2006), and *Crane v. Kentucky*, 476 U.S. 683 (1986), in which "arbitrary" state-law restrictions on defense evidence were held to violate the constitutional right to present a complete defense.  *See Holmes*, 547 U.S. at 329-330 (invalidating South Carolina rule restricting defendant's ability to

present evidence of third party's guilt); *Crane*, 476 U.S. at 691-692
(reversing Kentucky courts' limitation of defendant's evidence about
coercive interrogation).  These cases cast no doubt on "well-established
rules of evidence [that] permit trial judges to exclude evidence if its
probative value is outweighed by certain other factors such as unfair
prejudice, confusion of the issues, or potential to mislead the jury."
*Holmes*, 547 U.S. at 326 (citing Rule 403); *Crane*, 476 U.S. at 689-690
(acknowledging trial judges' "wide latitude" to exclude irrelevant,
marginal, prejudicial, or confusing evidence (citation omitted)).

The district court's grounds for excluding Dr. Graney's opinions
(IDRA and Rule 702) and Hudak's own testimony (IDRA and Rule 403)
are the type of well-established evidentiary rules that *Holmes* and
*Crane* were careful to not disturb.  Moreover, Hudak offers no argument
why rules of such long standing are constitutionally unsound.
Accordingly, Hudak's cursory invocation of *Holmes* and *Crane* does not
undermine the court's exclusion of his mental health evidence.

## II. The district court did not abuse its discretion by admitting evidence that Hudak possessed Nazi paraphernalia.

"District judges enjoy broad discretion to determine what evidence
should be admitted under [Rule 404(b)], which resides at the core of the

trial judge's function of handling evidentiary challenges." *United States v. Briley*, 770 F.3d 267, 275-276 (4th Cir. 2014). Rule 404(b) is "a rule of inclusion" because it "recognizes the admissibility of prior crimes, wrongs, or acts, with only the one stated exception": "to prove 'the character of a person in order to show action in conformity therewith.'" *Queen*, 132 F.3d at 994 (quoting Fed. R. Evid. 404(b)(1)). Prior-acts evidence is admissible if it is (1) "relevant to an issue other than character, such as intent"; (2) "necessary to prove an element of the crime charged"; (3) "reliable"; and (4) "probative" to a degree not "'substantially outweighed' by its prejudicial nature." *Id.* at 995 (quoting Fed. R. Evid. 403). The district court's rulings are reviewed for abuse of discretion and harmless error. *Briley*, 770 F.3d at 276.

The district court did not abuse its discretion by permitting the government to present evidence that Hudak possessed Nazi paraphernalia. The items—two Nazi flags bearing a swastika, a swastika patch, and an Iron Cross ring—were powerfully probative of Hudak's racial and ethnic animus, so they were proper evidence that he committed his offenses because of the victims' race, color, and national origin. Moreover, despite repeated warnings from the district court,

- 33 -

Hudak opened the door to evidence of his Nazi possessions through his attempts to give exculpatory testimony.

### A. The district court correctly admitted Hudak's Nazi paraphernalia.

### 1. Hudak's Nazi paraphernalia was significant evidence that he acted because of his victims' race, color, and national origin.

Because Hudak conceded his willfulness and the offense conduct (JA109-110), the focus at trial was Hudak's motive and intent for committing the charged offenses—that is, whether he acted "because of J.S.'s race and color" under 18 U.S.C. 245(b)(2) and "because of J.D.'s race and national origin" under 42 U.S.C. 3631(a). JA15-16; Br. 9 (agreeing disputed issue was Hudak's "racial animus").

Rule 404(b) identifies "motive" and "intent" as permissible reasons to offer evidence of prior crimes, wrongs, or acts. Fed. R. Evid. 404(b)(2). "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

The Nazi swastika "is a universal symbol of hatred," *United States v. Magleby*, 241 F.3d 1306, 1317 (10th Cir. 2001), and a "symbol[] of white supremacy," *United States v. Allen*, 341 F.3d 870, 885 (9th Cir. 2003). Evidence that a defendant possessed or displayed Nazi symbols therefore has significant probative value when offered against a defendant to show that he committed an offense because of race. For instance, in a case under 18 U.S.C. 245(b)(2)(B), the Ninth Circuit upheld "the admission at trial of skinhead and white supremacist evidence" against defendants who threatened and intimidated Black and Hispanic victims. *See Allen*, 341 F.3d at 885-886. The evidence included "photographs of their tattoos (e.g., swastikas and other symbols of white supremacy), Nazi-related literature," and "arm-bands with swastikas." *Id.* at 885. This evidence "properly was admitted to prove racial animus." *Id.* at 886.

Likewise, in a case under 42 U.S.C. 3631(a) against a defendant who fired shots into a Black family's home, the Ninth Circuit upheld admission of the defendant's swastika-bearing possessions—a poster, a flashlight, a plaque, and an armband—because they were "clearly relevant to establishing his racial hatred and that he acted on that

hatred, an element of the crime charged." *United States v. McInnis*, 976 F.2d 1226, 1231-1232 (9th Cir. 1992); *see United States v. Sheldon*, 107 F.3d 868 (4th Cir. 1997) (Tbl.) (following *McInnis* in case under 42 U.S.C. 3631(a)).  The Fifth Circuit upheld hate-crime convictions based in part on the defendants' numerous "tattoos associated with white-supremacist views." *See United States v. Cannon*, 750 F.3d 492, 506-507 (5th Cir. 2014).  And this Court upheld admission of a defendant's "Nazi and white supremacist paraphernalia" that the government offered to rebut the defendant's entrapment defense and to prove the defendant's predisposition to provide material support to anti-Semitic terrorist groups. *See Young*, 916 F.3d at 376-377.

The district court's decision to admit Hudak's Nazi paraphernalia thus rests on firm ground.  Because the swastika is a potent symbol of racial hatred, Hudak's possession of Nazi items bearing that symbol was significant evidence of his motive and intent.  It was highly probative in showing that he attacked J.S. and J.D. because of their race, color, and national origin. *See Allen*, 341 F.3d at 886; *McInnis*, 976 F.2d at 1231-1232.

### 2. Hudak opened the door to admission of his Nazi paraphernalia.

The sequence of events at trial confirms that the district court did not abuse its discretion by admitting evidence of Hudak's Nazi paraphernalia. "Whether or not prior bad act evidence is admissible under Federal Rule of Evidence 404(b), trial courts may admit such evidence after the opposing party has 'opened the door to its admission.'" *United States v. Birchette*, 908 F.3d 50, 61 (4th Cir. 2018) (quoting *United States v. McLaurin*, 764 F.3d 372, 383 (4th Cir. 2014)). The court gave Hudak several warnings against offering testimony that would open the door to admission of his Nazi possessions, which Hudak proceeded to disregard.

As Hudak acknowledges (Br. 11), the district court initially ruled that it would not admit evidence of Hudak's Nazi possessions. At the pretrial conference, the court ruled that the government could present evidence that Hudak owned a Confederate flag, a KKK flag, and a comic book with racist content. JA166. By contrast, the court excluded the Nazi paraphernalia, but it made clear that its ruling was "preliminary" and "subject to hearing the evidence in the case." JA167-169.

Hudak does not acknowledge the district court's repeated warnings at trial that his choices could open the door to exploration of his Nazi possessions.  On the morning the trial began, the court told Hudak that his testimony could make it "fair game for the Government to make inquiry . . . as to what [the Nazi items] were doing there in his house."  JA206.  After Hudak's counsel delivered an opening statement that referred to flags Hudak displayed at his home but omitted mention of his Nazi flags, the court again warned Hudak that his Nazi possessions could become "fair game" because "there are circumstances that could come up in which that unfair prejudice could be eliminated."  JA230-231.  And when Hudak proposed to present character witnesses, the court told him that this would permit the government to explore what those witnesses actually knew about Hudak, including whether "they were aware of those Nazi trinkets."  JA464.

Thus, when Hudak took the stand, he was solidly on notice that his testimony could open the door for the government to present evidence of his Nazi possessions to the jury.  Hudak then proceeded to do just that.  First, he claimed that he displayed a Confederate flag "because of the history of war for me, not any racisms, not any hate."

JA519-520.  Second, he said openly that he had "Nazi flags."  JA540.

Third, when explaining his possession of a KKK flag, he claimed merely

to be a "collector," suggesting he had these items for historical interest,

not ideological affinity.  JA542.  Fourth, he claimed he never displayed

the KKK flag.  JA542.  And fifth, after the government was permitted to

cross-examine Hudak about his Nazi possessions, he further claimed

during re-direct examination that he never displayed his Nazi flags

either.  JA596.

After Hudak's testimony, the district court reminded him of its

several warnings that "things could change" regarding admission of the

Nazi paraphernalia "if Mr. Hudak testified."  JA592.  The court said

that Hudak had opened the door by "explain[ing] away the Confederate

flags as his interest in military collecting."  JA592.  That testimony

made it important to admit the full range of Hudak's possessions in

order to avoid misleading the jury.  As the court correctly observed,

"[t]here's a difference between someone who maybe collects Union and

Confederate memorabilia as part of a study of the Civil War and

someone who collects Confederate flags and Nazi emblems."  JA593.

The court also correctly ruled that Hudak put his credibility at issue by claiming that he never displayed his KKK and Nazi flags. JA596, JA601-603.  That made it appropriate for the government to present its rebuttal witness, a state probation officer, who testified that he saw a Nazi flag hung from the door to Hudak's bedroom.  JA605-606.

"Parties take risks in making arguments squarely rebuttable using their own prior bad acts."  *Birchette*, 908 F.3d at 61.  Hudak took a risk by attempting to offer misleading exculpatory testimony about his possessions that the government had offered to demonstrate the racist motivations underpinning his offense conduct.  The district court did not abuse its discretion by acting on its numerous prior warnings and permitting the government to put Hudak's Nazi paraphernalia before the jury.

## B.    Hudak fails to show that the district court erred by admitting his Nazi paraphernalia.

Hudak does not address the extensive case law upholding the use of evidence like a defendant's Nazi possessions to show his motive and intent.  Though Hudak faults the district court for "revers[ing] itself" (Br. 11), he does not acknowledge the district court's repeated warnings that it may revisit its decision on admitting that evidence depending on

Hudak's testimony. Hudak cannot show an abuse of discretion by ignoring the legal authorities and developments at trial that explain the court's ruling. The arguments he does make lack merit too.

1. Hudak's arguments that his Nazi paraphernalia was not "publicly displayed," "involved in any of the incidents," or "unlawful" (Br. 10) are irrelevant to the question of whether Hudak's possession of them showed his racist motive and intent. Indeed, the admitted evidence of racial animus in the cases cited above often consisted of otherwise-lawful items, kept private. *See, e.g.*, *Young*, 916 F.3d at 376-377 (Nazi photos and other items found at defendant's home and on his computer); *McInnis*, 976 F.2d at 1229-1231 (swastika-bearing items found in defendant's garage). An item kept privately, rather than displayed publicly, still can shed light on the owner's motivations and intentions. *See, e.g.*, *Turpin v. Kassulke*, 26 F.3d 1392, 1400-1401 (6th Cir. 1994) (rejecting challenge to admission of diary entry that showed wealth-related motive for murder).

The fact Hudak did not display his Nazi paraphernalia during the incidents at issue at best "only affects the weight of the evidence, not its admissibility." *United States v. Recio*, 884 F.3d 230, 236 (4th Cir. 2018)

(rejecting argument that defendant's quotation of rap lyrics, offered to show motive, should have been excluded because it was open to innocent interpretation); *see also United States v. Bakker*, 925 F.2d 728, 736-737 (4th Cir. 1991) (rejecting argument that composites of televangelist's broadcasts, offered to show fraudulent fundraising appeals, should have been excluded as unrepresentative).

2.  Hudak's other contentions are no stronger.  He maintains that admitting his Nazi paraphernalia served to "subordinate reason to emotion."  Br. 10.  But "[j]ury trials are not antiseptic events, and in a case involving racial discrimination, upsetting facts may well emerge." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1132, 1135 (4th Cir. 1988) (holding district court erred in employment-discrimination case by excluding widespread "use of racial slurs and epithets" by defendant's employees).  Evidence of racist attitudes is "offensive precisely because [it] convey[s] the idea of racial bigotry." *Id.* at 1135.  In cases like these, such evidence nevertheless should be admitted because it is "closely tied to the inquiry into state of mind that is specifically required" by the applicable statutes.  *Ibid.*

Hudak cites no contrary authority. Though he relies (Br. 11) on *Morgan v. Foretich*, 846 F.2d 941 (4th Cir. 1988), that case supports the district court's ruling here. In *Morgan*, a case about child sexual abuse, this Court held that it was error to *exclude* prior-acts evidence—there, evidence that the defendant also had abused the plaintiff's half-sister. *Id.* at 944-945. "To simply exclude this evidence which went not to the character of the accused but rather to essential issues on trial and which was highly probative of the defendants' guilt was an abuse of discretion." *Id.* at 945. The district court's decision to admit the Nazi paraphernalia, highly probative evidence of Hudak's motive and intent, thus adheres to *Morgan*'s logic.

Importantly, the government and district court took measures that this Court has prescribed to lessen any unfair prejudice to Hudak. The government gave notice of its intent to present the Nazi paraphernalia well in advance of trial. Fed. R. Evid. 404(b)(3); JA17, JA27-28, JA32; *Queen*, 132 F.3d at 997. And the court warned Hudak that its initial exclusion of the Nazi paraphernalia was only a preliminary ruling and may be revisited later depending on the evidence presented. *See* pp. 10, 38-39, *supra*. The court also gave a

limiting instruction to the jury on the permissible consideration of Rule 404(b) evidence, explaining that Hudak was "not on trial for any act not charged in the indictment" and that evidence of his prior acts should be considered only for "the limited purposes of determining [Hudak's] knowledge, motivation, and intent." JA621-622; *Queen*, 132 F.3d at 997. These measures further indicate that the district court did not abuse its discretion.

Hudak also briefly suggests (Br. 10) that the Nazi paraphernalia was cumulative of the other evidence indicating his racial animus. This argument has two threshold problems. First, Hudak did not make a cumulativeness objection when the government informed the court it would cross-examine Hudak on his Nazi possessions. JA568. His cumulativeness argument therefore is reviewed only for plain error. *See United States v. Keita*, 742 F.3d 184, 189 (4th Cir. 2014) (holding that plain-error review applies when defendant fails to "state[] the specific ground" for objection to evidentiary ruling (quoting Fed. R. Evid. 103(a)(1)) (alteration in original)). Second, Hudak devotes only a sentence to cumulativeness, and a party waives appellate review "when

the opening brief merely 'takes a passing shot at the issue.'" *Elsheikh*,

103 F.4th at 1012 n.5 (quoting *Grayson O Co.*, 856 F.3d at 316).

To the extent that Hudak makes a proper cumulativeness

argument, it fails in any event. Evidence may be cumulative when it

"merely repeats evidence already admitted" or is "overwhelming in

quantity." 2 Weinstein's Federal Evidence § 403.06 (2024); *e.g.*, *United

States v. Edwards*, 702 F.2d 529, 530 (5th Cir. 1983) (affirming

exclusion of "twenty-five additional character witnesses" after five had

already testified). As explained, Hudak gave misleading testimony

about being a collector of interesting historical items and about never

displaying his KKK or Nazi flags. *See* pp. 38-39, *supra*. Evidence that

Hudak had and displayed Nazi paraphernalia served to rebut that

misleading testimony specifically, which the evidence of racial animus

put forth before Hudak testified could not do as directly. The Nazi

paraphernalia thus was not cumulative of prior evidence but made a

discrete contribution to other evidence of animus presented by the

government.

3. Finally, though the district court did not err by admitting

Hudak's Nazi paraphernalia, any such error would be reviewed for

- 45 -

harmlessness. *See United States v. Walker*, 32 F.4th 377, 394 (4th Cir. 2022). "Erroneously admitted evidence is harmless if a reviewing court is able to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

In arguing that the Nazi paraphernalia was cumulative, Hudak tacitly acknowledges that the other evidence of his racial and ethnic animus was extensive. Indeed it was. Before seeing Hudak's Nazi paraphernalia, the jury already had heard that Hudak yelled slurs and invective at J.S. and J.D. as he attacked them. JA240 (calling J.S. "nigger"), JA421 (calling J.D. and his family "a whole bunch of fucking Mexicans" who "should go to hell"). The jury heard Hudak referring to J.D.'s family as "motherfucking Mexicans" who "need to go back to their country" and "don't belong here." JA374. The jury also saw his Facebook posts about them, including the picture of their home that he captioned, "Idiots from Mexico in my neighborhood, illegal immigrants." JA378. Beyond J.S. and J.D., the jury heard that Hudak repeatedly

targeted other Black and Hispanic motorists for threats and intimidation, using racial slurs against them in the process. JA312-314, JA317-318, JA325-326. And the jury saw Hudak's other possessions indicating his racial and ethnic animus, not least his KKK flag. JA342.

This evidence provided a robust basis for the jury to conclude that Hudak attacked J.S. because of his race and color and attacked J.D. because his race and national origin. Accordingly, it cannot be said that the jury was "substantially swayed" by Hudak's Nazi paraphernalia to reach a result that the rest of the record would not have otherwise led the jury to reach. *Kotteakos*, 328 U.S. at 765.

**CONCLUSION**

For the foregoing reasons, this Court should affirm Hudak's

convictions.

Respectfully submitted,

SANDRA J. HAIRSTON                KRISTEN CLARKE
  United States Attorney            Assistant Attorney General

JOANNA G. MCFADDEN                s/ Matthew N. Drecun
ASHLEY E. WAID                    ELIZABETH PARR HECKER
  Assistant United States Attorneys  MATTHEW N. DRECUN
  United States Attorney's Office     Attorneys
  Middle District of North Carolina   Department of Justice
  101 S. Edgeworth St., 4th Floor     Civil Rights Division
  Greensboro, NC 27401                Appellate Section
                                      Ben Franklin Station
                                      P.O. Box 14403
                                      Washington, D.C.  20044-4403
                                      (202) 550-9589

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that this appeal can be resolved on the briefs, but it does not object to oral argument if it would aid this Court's review.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 9040 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Matthew N. Drecun
MATTHEW N. DRECUN
 Attorney

Date:  December 6, 2024